# EXHIBIT A

**Answer To Complaint;
Counterclaim And Cross-Claims**

Electronically Filed
1/9/2026 5:21 PM
Steven D. Grierson
CLERK OF THE COURT

1

**AACC**
**BANKRUPTCY RECOVERY GROUP**
GREGORY E. GARMAN, ESQ.

2

Nevada Bar No. 6654
ggarman@brg.legal

3

TALITHA GRAY KOZLOWSKI, ESQ.

4

Nevada Bar No. 9040
tgray@brg.legal

5

DYLAN CICILIANO, ESQ.
Nevada Bar No. 12348

6

dciciliano@brg.legal
7251 Amigo Street, Suite 210

7

Las Vegas, Nevada 89119
Tel: (702) 483-6126

8

*Attorneys for Defendants/Cross-Claimant*
*Ryan A. Andersen, Chapter 7 Trustee*

9

10

**DISTRICT COURT**

11

**CLARK COUNTY, NEVADA**

12

AGNES ALEKSANDER, individually,

Case No.: A-25-928759-B
Dept. No.: IX

13

Plaintiff,

14

vs.

15

AFFINITYLIFESTYLES.COM, INC. d/b/a
REAL WATER, a Nevada corporation; REAL

16

WATER INC., a Delaware Corporation; OHIO
SECURITY INSURANCE COMPANY;

17

PEERLESS INDEMNITY INSURANCE
COMPANY; THE OHIO CASUALTY

18

INSURANCE COMPANY; WEST
AMERICAN INSURANCE COMPANY; DOE

19

INDIVIDUALS 1-10; and ROE ENTITIES 1-10,

20

Defendants.

**DEFENDANTS**
**AFFINITYLIFESTYLES.COM, INC.**
**d/b/a REAL WATER AND REAL WATER,**
**INC.'S ANSWER TO PLAINTIFF'S**
**COMPLAINT; COUNTERCLAIM AND**
**CROSS-CLAIMS**

**DEMAND FOR JURY TRIAL**

21

RYAN A. ANDERSEN, in his capacity as
Chapter 7 Trustee for the bankruptcy estates of

22

Affinitylifestyles.com, Inc. d/b/a Real Water,
Real Water, Inc., and Real Water of Tennessee,

23

LLC,

24

Counterclaimant/Cross-Claimant,

25

vs.

26

OHIO SECURITY INSURANCE COMPANY,
a New Hampshire company; PEERLESS

27

INDEMNITY INSURANCE COMPANY, an
Illinois company; THE OHIO CASUALTY

28

INSURANCE COMPANY, a New Hampshire

1 | company; WEST AMERICAN INSURANCE
2 | COMPANY, an Indiana Company; Doe Individuals I-X and Roe Entities 1-10, inclusive,

3 | Counter-Defendant/Liberty Defendants.

4

5 | **INTRODUCTION**

6 | Ryan A. Andersen (the "Trustee"), in his capacity as the duly-appointed Chapter 7 Trustee

7 | for the bankruptcy estates of Affinitylifestyles.com, Inc. d/b/a Real Water ("Affinity/Real Water"),

8 | Real Water, Inc. ("RWI"), and Real Water of Tennessee, LLC ("RWT," and collectively the "Real

9 | Water Debtors" or "Real Water"), hereby files this Answer to Plaintiff Agnes Aleksander's

10 | Complaint and asserts Counterclaims against Plaintiff, and Cross-Claims against Liberty

11 | Defendants Ohio Security Insurance Company, Peerless Indemnity Insurance Company, The Ohio

12 | Casualty Insurance Company, West American Insurance Company (collectively, the "Liberty

13 | Defendants"), and Does 1-50.

14 | **ANSWER TO PLAINTIFF'S COMPLAINT**

15 | The Real Water Debtors, by and through Ryan A. Andersen as Chapter 7 Trustee and estate

16 | representative, hereby answer Plaintiff's Complaint as follows:

17 | **RESPONSES TO ALLEGATIONS**

18 | 1.    In response to Paragraph 1 of the Complaint, the Real Water Debtors admit that this

19 | case involves an accepted offer of judgment under NRCP 68. The Real Water Debtors further state

20 | that the Liberty Defendants controlled the defense and settlement of claims against Real Water

21 | and accepted Plaintiff's offer of judgment on Real Water's behalf.

22 | 2.    In response to Paragraph 2 of the Complaint, the Real Water Debtors admit the

23 | allegations contained therein.

24 | 3.    In response to Paragraph 3 of the Complaint, the Real Water Debtors admit the

25 | allegations contained therein.

26 | 4.    In response to Paragraph 4 of the Complaint, the Real Water Debtors admit the

27 | allegations contained therein.

28 | . . .

5.      In response to Paragraph 5 of the Complaint, the Real Water Debtors believe the allegations to be true and admit them on that basis.

6.      In response to Paragraph 6 of the Complaint, the Real Water Debtors believe the allegations to be true and admit them on that basis.

7.      In response to Paragraph 7 of the Complaint, the Real Water Debtors believe the allegations to be true and admit them on that basis.

8.      In response to Paragraph 8 of the Complaint, the Real Water Debtors believe the allegations to be true and admit them on that basis.

9.      In response to Paragraph 9 of the Complaint, the request does not require a response and therefore the Real Water Debtors deny the same.

10.     In response to Paragraph 10 of the Complaint, the Real Water Debtors admit the allegations contained therein.

11.     In response to Paragraph 11 of the Complaint , the Real Water Debtors admit the allegations contained therein.

12.     In response to Paragraph 12 of the Complaint, the Real Water Debtors admit the allegations contained therein.

13.     In response to Paragraph 13 of the Complaint, the Real Water Debtors admit that Plaintiff is a plaintiff in a personal injury action against the Real Water Debtors, but denies all other allegations set forth therein.

14.     In response to Paragraph 14 of the Complaint, the Real Water Debtors admit that Plaintiff joined the consolidated Real Water litigation in Clark County but the Real Water Debtors lack sufficient knowledge or information to the remainder of the allegations, and therefore deny the same.

15.     In response to Paragraph 15 of the Complaint, the Real Water Debtors lack sufficient information and knowledge to admit or deny the allegations contained therein, and therefore deny the same.

16.     In response to Paragraph 16 of the Complaint, the Real Water Debtors admit that Real Water's counsel, acting under the direction and control of the Liberty Defendants, accepted

Plaintiff's Offer of Judgment.   The Real Water Debtors deny all other allegations contained therein.

17.     In response to Paragraph 17 of the Complaint, the Real Water Debtors admit that payment was not made within twenty-one days and that the Liberty Defendants controlled all settlement funding decisions and refused to fund the accepted offer despite their obligations to do so. The Real Water Debtors deny all other allegations contained therein.

18.     In response to Paragraph 18 of the Complaint, the Real Water Debtors admit the allegations contained therein.

19.     In response to Paragraph 19 of the Complaint, the Real Water Debtors admit that the Liberty Defendants issued liability insurance policies to the Real Water Debtors.

20.     In response to Paragraph 20 of the Complaint, the Real Water Debtors admit that the Liberty Defendants "undertook the defense."

21.     In response to Paragraph 21 of the Complaint, the Real Water Debtors state that the request calls for a legal conclusion and therefore no response is needed. To the extent a response is required, the Real Water Debtors admit that the Liberty Defendants are obligated to pay the accepted offer of judgment.

22.     In response to Paragraph 22 of the Complaint, the Real Water Debtors admit that the Liberty Defendants accepted and paid certain offers of judgment and deny all other allegations contained therein.

23.     In response to Paragraph 23 of the Complaint, the Real Water Debtors deny the allegations contained therein.

24.     In response to Paragraph 24 of the Complaint, the Real Water Debtors state that the applicable insurance policy speaks for itself and therefore denies the allegations to the extent they are inconsistent with the policy at issue.

25.     In response to Paragraph 25 of the Complaint, the Real Water Debtors state that the request calls for a legal conclusion and to the extent a response is needed, denies the allegation on that basis.

. . .

26.     In response to Paragraph 26 of the Complaint, the Real Water Debtors admit that Plaintiff has sustained damages as a result of the failure to pay the accepted Offer of Judgment. The Real Water Debtors affirmatively state that any such damages are the direct and proximate result of the Liberty Defendants' breach of their insurance obligations and bad faith. The remainder of the allegations call for a legal conclusion and the Real Water Debtors deny the same on that basis.

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against the Real Water Debtors and the Liberty Defendants)**

27.     In response to Paragraph 27 of the Complaint, the Real Water Debtors reincorporate their responses in the previous paragraphs herein.

28.     In response to Paragraph 28 of the Complaint, the Real Water Debtors admit that the Liberty Defendants caused Real Water to accept Plaintiff's Offer of Judgment under NRCP 68.

29.     In response to Paragraph 29 of the Complaint, the Real Water Debtors admit that the Liberty Defendants, by virtue of their insurance contracts, were obligated to indemnify the Real Water and to satisfy Plaintiff's accepted Offer of Judgment.

30.     In response to Paragraph 30 of the Complaint, the Real Water Debtors admit that the Liberty Defendants failed to pay Plaintiff the $250,000.00.

31.     In response to Paragraph 31 of the Complaint, the Real Water Debtors lack sufficient information to admit or deny the allegation and on that basis deny the allegation.

**SECOND CAUSE OF ACTION**

**(Fraud Against the Real Water Debtors and the Liberty Defendants)**

32.     In response to Paragraph 32 of the Complaint, the Real Water Debtors reincorporate their responses in the previous paragraphs herein.

33.     In response to Paragraph 33 of the Complaint, the Real Water Debtors admit that the Liberty Defendant's caused the Real Water Debtors to accept Plaintiff's Offer of Judgment.

34.     In response to Paragraph 34 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding the

insurers' intent at the time of acceptance and therefore deny the same.

35.     In response to Paragraph 35 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding the insurers' alleged ratification or advancement of any fraudulent scheme and therefore deny the same.

36.     In response to Paragraph 36 of the Complaint, the Real Water Debtors admit that the Liberty Defendants, through their control of defense counsel, caused an Offer of Judgment to be accepted and later caused payment to be made to the Estate of Stephan Bonnar on January 9, 2025.

37.     In response to Paragraph 37 of the Complaint, the Real Water Debtors admit that the Liberty Defendants, through their control of defense counsel, caused an Offer of Judgment to be accepted on May 5, 2023, and later caused attempted payment to Keith Haley.

38.     In response to Paragraph 38 of the Complaint, the Real Water Debtors admit that the Liberty Defendants, through their control of defense counsel, caused an Offer of Judgment to be accepted on May 2, 2023, to plaintiffs Orion, Bryan, and Camille Gallagher and later caused attempted payment, and that on August 29, 2025, the Liberty Defendants caused an amended Offer of Judgment to be accepted and later paid to the Gallagher family.

39.     In response to Paragraph 39 of the Complaint, the Real Water Debtors deny the allegations contained therein.

40.     In response to Paragraph 40 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding Plaintiff's damages resulting from alleged fraudulent conduct and therefore deny the same.

### THIRD CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against the Real Water Debtors and the Liberty Defendants)**

41.     In response to Paragraph 41 of the Complaint, the Real Water Debtors reincorporate their responses in the previous paragraphs herein.

. . .

42.     In response to Paragraph 42 of the Complaint, the Real Water Debtors deny the allegations contained therein as to the Real Water Debtors. Any breach of the implied covenant of good faith and fair dealing is attributable solely to the Liberty Defendants.

43.     In response to Paragraph 43 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding the Liberty Defendants' interpleader action and therefore deny the same.

44.     In response to Paragraph 44 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding what the Liberty Defendants knew or should have known and therefore deny the same.

45.     In response to Paragraph 45 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding communications between Plaintiff's counsel and Defendants' counsel and therefore deny the same.

46.     In response to Paragraph 46 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding Defendants' counsel's acknowledgment and therefore deny the same.

47.     In response to Paragraph 47 of the Complaint, the Real Water Debtors deny the allegations contained therein.

48.     In response to Paragraph 48 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding Plaintiff's damages and therefore deny the same.

## FOURTH CAUSE OF ACTION

### (Unfair Claims Settlement Practices – NRS 686A.310 Against the Liberty Defendants)

49.     In response to Paragraph 49 of the Complaint, the Real Water Debtors reincorporate their responses in the previous paragraphs herein.

50.     In response to Paragraph 50 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding the Liberty Defendants' interpleader action and therefore deny the same.

. . .

51.     In response to Paragraph 51 of the Complaint, the Real Water Debtors admit that the Liberty Defendant's caused the acceptance of Plaintiff's Offer of Judgment and that liability for injuries caused by the Real Water Debtors product had been adjudicated in multiple trials, and denies all other allegations contained therein.

52.     In response to Paragraph 52 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding the Liberty Defendants' unfair practices and therefore deny the same.

53.     In response to Paragraph 53 of the Complaint, the Real Water Debtors deny the allegations contained therein on behalf of the Real Water. The Real Water are not insurers and are not subject to NRS 686A.310.

54.     In response to Paragraph 54 of the Complaint, the Real Water Debtors lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding Plaintiff's entitlement to statutory damages and therefore deny the same.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Against the Liberty Defendants)

55.     In response to Paragraph 55 of the Complaint, the Real Water Debtors reincorporate their responses in the previous paragraphs herein.

56.     In response to Paragraph 56 of the Complaint, the Real Water Debtors admit that a justiciable controversy exists.

57.     In response to Paragraph 57 of the Complaint, the Real Water Debtors lack a sufficient basis to admit or deny the allegations contained therein.

58.     In response to Paragraph 58 of the Complaint, the Real Water Debtors admit the allegations contained therein.

59.     In response to Paragraph 59 of the Complaint, the Real Water Debtors state that the allegations calls for a legal conclusion and therefore no response is required. To the extent that a response is required, the Real Water Debtors admit that the Liberty Defendants had an obligation to satisfy the offer of judgment.

. . .

60.     In response to Paragraph 60 of the Complaint, the Real Water Debtors admit the allegation contained therein.

61.     In response to Paragraph 60 of the Complaint, the Real Water Debtors state that they are unable to admit or deny the allegations contained therein as the allegation is a statement and not a factual allegation that can be admitted or denied.

## PRAYER FOR RELIEF

62.     To the extent a response to Plaintiff's prayer for relief is required, the Real Water Debtors deny any wrongdoing, and deny that Plaintiff is entitled to recovery or relief against the Real Water Debtors.

## AFFIRMATIVE DEFENSES

63.     The Real Water Debtors notice the following potential defenses and affirmative defenses to Plaintiff's claims.  This list, however, is not intended to be exhaustive, nor is it intended to shift the applicable burdens of proof for Plaintiff's claims.  Real Water intend to rely upon any other defense and/or affirmative defense that may become available during the proceedings in this case, and hereby reserve their right to amend their Answer to assert any such defense(s).

## FIRST AFFIRMATIVE DEFENSE

### (Bankruptcy Claim)

64.     The Real Water Debtors filed Chapter 7 bankruptcy petitions on August 19, 2021 in the United States Bankruptcy Court for the District of Nevada. Any claims against the Real Water that are liquidated claims in excess of the face amount of the various insurance policies issued by the Liberty Defendants in this proceeding are required to be returned to the Bankruptcy Court for treatment.

## SECOND AFFIRMATIVE DEFENSE

### (Insurer Control and Responsibility)

65.     The Liberty Defendants assumed control of the Real Water' defense and settlement obligations under the insurance policies. Any failure to pay Plaintiff's accepted Offer of Judgment is the direct result of the Liberty Defendants' decisions and conduct, not any independent action

or failure by the Real Water.

### THIRD AFFIRMATIVE DEFENSE

#### (Insurer Indemnity Obligation)

66.     Under the insurance policies issued by the Liberty Defendants, the Liberty Defendants are obligated to indemnify the Real Water Debtors for covered judgments, interest and settlements. Plaintiff's accepted Offer of Judgment is a covered claim, and the Liberty Defendants' failure to pay constitutes a breach of their indemnity obligations to Real Water.

### FOURTH AFFIRMATIVE DEFENSE

#### (Reservation of Defenses)

67.     The Real Water Debtors reserve the right to assert additional affirmative defenses as they become known through discovery or further investigation.

### FIFTH AFFIRMATIVE DEFENSE

#### (Superseding and Intervening Cause)

68.     The Liberty Defendants' refusal to fund the accepted Offer of Judgment constitutes a superseding and intervening cause that breaks any causal chain between the Real Water Debtors and Plaintiff's alleged damages. The Liberty Defendants controlled Real Water Debtors' defense and settlement under the insurance policies. After counsel—acting under the Liberty Defendants' direction—accepted Plaintiff's Offer of Judgment, the Liberty Defendants made an independent decision to refuse funding. That decision was unforeseeable to the Real Water Debtors, was not within the Real Water Debtors' control, and is the sole proximate cause of Plaintiff's failure to receive timely payment. Accordingly, any liability for non-payment runs exclusively to the Liberty Defendants.

### SIXTH AFFIRMATIVE DEFENSE

#### (No Proximate Causation)

69.     The Real Water Debtors did not proximately cause Plaintiff's alleged damages. The proximate cause of Plaintiff's non-payment is the Liberty Defendants' bad faith refusal to fund the accepted Offer of Judgment from available policy proceeds—a decision made exclusively by the Liberty Defendants in the exercise of their contractual control over settlement funding. The Real

Water Debtors had no ability to pay the Offer of Judgment independent of insurance, and the Liberty Defendants' conduct was the direct and proximate cause of any damages Plaintiff sustained.

### SEVENTH AFFIRMATIVE DEFENSE

### (Lack of Authority Over Settlement Funding)

70.    The Real Water Debtors lacked any authority to fund or cause payment of the accepted Offer of Judgment. Under the insurance policies issued by the Liberty Defendants, the Liberty Defendants assumed control of Real Water Debtors' defense and possessed exclusive authority over settlement funding decisions. Defense counsel who accepted Plaintiff's Offer of Judgment acted under the direction and control of the Liberty Defendants, not the Real Water Debtors. The Real Water Debtors, as Chapter 7 debtors, had no independent financial capacity or contractual authority to direct payment of accepted settlements. Accordingly, any failure to pay is attributable solely to the Liberty Defendants, who retained and exercised exclusive control over the settlement funding process.

### EIGHTH AFFIRMATIVE DEFENSE

### (No Scienter or Fraudulent Intent)

71.    The Real Water Debtors had no scienter or fraudulent intent with respect to the acceptance of Plaintiff's Offer of Judgment. Any "representation" arising from the acceptance was made by defense counsel acting under the direction, control, and funding of the Liberty Defendants—not at the direction of the Real Water Debtors. The Real Water Debtors, through the Chapter 7 Trustee, had no knowledge that the Liberty Defendants intended to refuse payment of the accepted Offer of Judgment, and the Real Water Debtors did not participate in, direct, or benefit from any decision to withhold payment. Plaintiff's fraud claim fails as a matter of law because the Real Water Debtors lacked the requisite intent to deceive, knowledge of falsity, or purpose to induce reliance.

. . .

. . .

. . .

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NINTH AFFIRMATIVE DEFENSE

### (No Misrepresentation of Material Fact)

72.     The Real Water Debtors made no misrepresentation of material fact to Plaintiff. The acceptance of Plaintiff's Offer of Judgment was genuine.. The failure to pay was not a "misrepresentation" by Real Water Debtors but rather the Liberty Defendants' subsequent decision—made in the exercise of their exclusive control over policy proceeds—to refuse funding. To the extent any representation was made regarding payment, it was made by or attributable to the Liberty Defendants through their control of defense counsel and the settlement process.

## TENTH AFFIRMATIVE DEFENSE

### (Good Faith)

73.     The Real Water Debtors, through Ryan A. Andersen as Chapter 7 Trustee, have at all times acted in good faith. The Trustee has fulfilled his fiduciary duties to the bankruptcy estates and has not engaged in any conduct designed to defraud, mislead, or harm Plaintiff. Any bad faith in the handling of Plaintiff's claim is attributable solely to the Liberty Defendants, who controlled the defense and settlement process, made the decision to accept Plaintiff's Offer of Judgment, and thereafter refused to fund the accepted settlement despite their contractual obligations to do so. The Real Water Debtors' good faith is further demonstrated by the assertion of Cross-Claims against the Insurer Liberty Defendants seeking to hold them accountable for their misconduct.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Lack of Authority)

74.     The Liberty Defendants lacked any authority to obligate the Real Water Debtors to be responsible for any amount under an Offer of Judgment. Under the insurance policies issued by the Liberty Defendants, the Liberty Defendants assumed control of the Real Water Debtors' defense and possessed exclusive authority over settlement funding decisions. Defense counsel who accepted Plaintiff's Offer of Judgment acted under the direction and control of the Liberty Defendants, not the Real Water Debtors. The Real Water Debtors, as a Chapter 7 debtor, had no ability to direct payment of accepted settlements.

. . .

1

## **COUNTERCLAIMS AND CROSS CLAIMS**

2       Defendant and Cross-Claimant Ryan A. Andersen (the "Trustee"), in his capacity as the

3 duly-appointed Chapter 7 trustee for the bankruptcy estates of Affinitylifestyles.com, Inc. d/b/a

4 Real Water ("Affinity/Real Water"), Real Water, Inc. ("RWI"), and Real Water of Tennessee,

5 LLC ("RWT," and collectively the "Debtors" or the "Real Water Debtors"), by and through his

6 special counsel, the law firm of Bankruptcy Recovery Group LLP, hereby files his counterclaims

7 and cross-claims against Plaintiff, Defendants Ohio Security Insurance Company ("OSI"),

8 Peerless Indemnity Insurance Company ("Peerless"), The Ohio Casualty Insurance Company

9 ("OCI"), West American Insurance Company ("WAI", and collectively with OSI, Peerless, OCI,

10 the "Liberty Defendants" or the "Insurers"); DOE INDIVIDUALS I-X, inclusive, and ROE

11 ENTITIES 1-10, inclusive, as follows:

12

## **INTRODUCTION**

13       1.     This action arises from what is likely the most egregious and consequential case of

14 insurance bad faith in Nevada history. The Liberty Defendants issued liability insurance policies

15 to RWI and related entities with approximately $22 million in aggregate coverage.

16       2.     When mass tort litigation arose, the Liberty Defendants issued a "Reservation of

17 Rights" to Real Water and took total and complete control of the legal defense, as was their right.

18 Such control extended to the selection of counsel, trial strategy, settlement strategy and total

19 control over the acceptance/rejection of every settlement offer and/or offer of judgment.

20       3.     The Liberty Defendants had (and have) an absolute duty to protect Real Water from

21 catastrophic liability (and excess liability).  That duty was undermined and ultimately abrogated

22 when the Liberty Defendants put their interests ahead of those of their insured.  Among other

23 duties, the Liberty Defendants had a duty to defend the case on behalf of Real Water, to pay, where

24 appropriate, the insurance limits that were purchased by Real Water, to accept (and pay) reasonable

25 settlement offers, and to pay interest on accounts of judgments that were obtained by plaintiffs.

26       4.     Instead, the Liberty Defendants put their own interests ahead of those of their

27 insured to limit their own exposure. While the Liberty Defendants could have resolved all or most

28 of the cases within policy limits, they instead made the intentional choice of permitting billions of

dollars of judgments to be entered against Real Water to further their own coverage defenses.

5.     This insurance dispute is not an abstract dispute about policy wording. It is about what happens when the insurers, entrusted with protecting their insured and the public, decide that delay, denial, and litigation brinkmanship are better business than paying reasonable settlements for catastrophic harm.

6.     The Liberty Defendants were completely informed and controlled every aspect of the litigation. The underlying pleadings and trial record reflect grave injuries, including liver failure, two liver transplants, multiple deaths, and permanent liver damage. The Liberty Defendants retained experts that confirmed the cause and extent of the injuries claimed by the plaintiffs. The liability was so certain that the Liberty Defendants directed Real Water's counsel to concede liability and effectively beg forgiveness from the jury. This is all the while having the opportunity to resolve the individual cases within policy limits. And when they rejected the settlement offers, the Liberty Defendants knew that the likely verdicts would exceed hundreds of millions of dollars.

7.     And in fact, that is what happened. In one consolidated matter alone, the jury's compensatory verdict approached $100,000,000.00, reflecting the reality of the plaintiffs' injuries. This is in addition to pre-judgment interest that approached 10% per year, tens of millions in attorneys' fees, and billions in punitive damages. The catastrophic judgments were not the products of runaway juries or judicial errors, but of the nature of the injuries suffered. Time after time again, similar verdicts were entered against Real Water. Those verdicts were not only foreseeable but known by the Liberty Defendants to be the likely outcome.

8.     Nonetheless, they proceeded not in the best interest of their Insured, but in a manner designed to limit their own exposure through the strengthening of their coverage defenses. And because Real Water ultimately entered Chapter 7 bankruptcy, the Liberty Defendants knew the practical reality, insurance proceeds were the only meaningful source of recovery. The Liberty Defendants counted on the fact that they could delay and deny coverage until the Debtors and terminally ill plaintiffs could go on no longer. That grotesque strategy is what necessitates this action.

9.      Among other malfeasance, the Liberty Defendants systematically pursued a strategy that placed their own financial interests ahead of their insured's interests. They declined to accept reasonable settlement opportunities, rejected or ignored a wave of Nevada Rule of Civil Procedure 68 offers of judgment ("OOJs") that were within available limits (or could have been paid within available limits through a reasonable allocation plan), and instead watched as five trials resulted in verdicts totaling over $8.4 billion against their insured all while stating that such liability was not their problem. The Liberty Defendants have refused to pay the valid creditors of the trustees' bankruptcy estate for whom the trustee owes a fiduciary duty and expected the Liberty Defendants to satisfy such claims.

10.      Despite the existence of an actual conflict, the Liberty Defendants did not ensure that the Real Water Debtors had independent counsel and did not meaningfully coordinate the defense of the actions with the Trustee. Instead, the Liberty Defendants concealed the conflict to maintain control over the litigation and implemented a strategy that would limit the Liberty Defendants' liability, all but guaranteeing that the Real Water Debtors would be subject to catastrophic excess liabilities and third-party claims exceeding 100s of millions of dollars.

11.      The Liberty Defendants' tactics went so far as to intentionally create and then exploit conflicts of interest for their benefit to the detriment of their insured. While defending Real Water under reservations of rights, the Liberty Defendants directed the Real Water Debtors' defense counsel to make sweeping admissions of liability and medical causation in the underlying cases. The Liberty Defendants then attempted to distance themselves from those admissions and from the ensuing exposure by invoking coverage defenses and alleged "cooperation" breaches that were manufactured by the Liberty Defendants for their own misguided strategy to limit their own exposure.

12.      The OOJs are emblematic of the Liberty Defendants' bad faith and conflicted decisions that ultimately led to billions of dollars in jury verdicts for which the Liberty Defendants are now indefensibly liable. Nevada's OOJ framework exists for a reason: to encourage settlement, to stop needless trials, and to prevent exactly what happened here—avoidable litigation that multiplies harm and cost. The injured plaintiffs served offers of judgment that were finite,

reasonable, within policy limits and (critically) designed to end the cases. The OOJs were issued at times when the Liberty Defendants had abundant discovery and ample notice of the magnitude of injury. All that was at issue was the amount of the plaintiffs' judgment.

13.     Despite the likelihood of nine and ten figure judgment, the plaintiffs made OOJs that were within policy limits and inclusive of fees, costs, punitive damages and interest. This provided the Liberty Defendants with the opportunity to cap exposure and provide certainty. Against the potential exposure, it was patently unreasonable and in bad faith for the Liberty Defendants to reject any OOJ within policy limits.

14.     In each instance, however, the Liberty Defendants exerted absolute control (to the exclusion of the Trustee) as to whether the OOJs would be accepted or rejected, and if accepted, whether they would be paid. They frequently made the decision to pay nothing, rather than an amount within limits.

15.     In most cases, the Liberty Defendants rejected the OOJs outright. Those rejected offers were not speculative and the Liberty Defendants knew that the plaintiffs' eventual judgments would exceed any OOJ and subject the Real Water Debtors to hundreds of millions of dollars in excess liability. They just did not care. Rather than protect the Real Water Debtors, the Liberty Defendants chose the opposite: reject, delay, litigate, and prejudice the Real Water Debtors and their creditors, in the hope that they could avoid paying any judgments whatsoever.

16.     The Liberty Defendants' conduct did not merely expose Real Water to billions in excess judgments. It inflicted a second injury on the victims: the injury of being told—implicitly, repeatedly, and cruelly—that their suffering would be used as leverage, that their damages could be ignored, and that their cases could be postponed indefinitely while Liberty Defendants pursued strategies designed to reduce payment rather than deliver it.

17.     As a result of the Liberty Defendants conduct, the Real Water have now been exposed to massive and avoidable judgments, punitive damages, attorneys' fee awards, and statutory interest—liabilities that are ultimately the liability of the bankruptcy estate via direct claims from plaintiffs as well as claims for contribution and indemnity by co-defendants that increase the estates' claims pool, administrative costs, and litigation burden.

18.     The Liberty Defendants conduct is particularly egregious because the Liberty Defendants knew Real Water had few assets other than insurance, and that the Trustee had assumed and expected that valid claims of the state's mass tort victims would obtain a meaningful recovery from the insurance policies it had obtained and paid for.  The Liberty Defendants' control over litigation defense, case strategy, and settlement therefore carried a heightened duty to act promptly, reasonably, and in good faith.

19.     Confoundingly, after billions of dollars of judgments were entered against Real Water, the insured began to act in an inconsistent fashion to once again protect their own interests. Concerned about their own bad faith conduct and the liability that would flow from it, the Liberty Defendants started accepting OOJs paying some and refusing to pay others on contrived bases, instead opting to engage in another round of litigation with Real Water and the plaintiffs, all while post-judgment interest continued to accrue (which the Liberty Defendants are independently and contractually obligated to pay but have refused to pay ).

20.     The Trustee seeks declaratory relief and damages for (among other things): (i) The Liberty Defendants breach of their contractual duties to defend, indemnify, and pay covered judgments, settlements, attorneys' fees, costs, and interest; (ii) The Liberty Defendants tortious bad faith, including failure to settle when liability was reasonably clear; (iii) The Liberty Defendants' violations of the unfair claims practices act; and (iv) The Liberty Defendants waiver/estoppel based on their defense control and conduct.

21.     The Trustee also seeks to recover consequential damages resulting from the Liberty Defendants misconduct, including the inevitable contribution and indemnity claims being asserted in the bankruptcy cases by distributors and retailers of Real Water who were forced to fund settlements and who now seek reimbursement from the bankruptcy estates.

22.     Unless the Liberty Defendants are held accountable for their contractual and extra-contractual obligations, Real Water's bankruptcy estates—and the injured consumers and distributors who are creditors of those estates—will continue to bear the costs of the Liberty Defendants bad faith and claims-handling abuses.

. . .

## **PARTIES, JURISDICTION, AND VENUE**

23.     Cross-Claimant Ryan A. Andersen is a natural person and a citizen of Nevada who was appointed as Chapter 7 trustee on August 19, 2021 in the United States Bankruptcy Court for the District of Nevada in *In re Affinitylifestyles.com, Inc.*, Case No. 21-14099; *In re Real Water, Inc.*, Case No. 21-14101; and *In re Real Water of Tennessee, LLC*, Case No. 21-14102 (collectively, the "Bankruptcy Cases").

24.     The Real Water Debtors are the debtors in the Bankruptcy Cases. The Trustee is the sole representative of the bankruptcy estates and has standing to pursue the estates' causes of action, including claims for insurance benefits and claims for insurer bad faith and unfair claims practices.

25.     Cross-Defendant Ohio Security Insurance Company ("Ohio Security" or "OSI") is an insurance company authorized to transact business in Nevada and, on information and belief, has a principal place of business in Massachusetts.

26.     Cross-Defendant Peerless Indemnity Insurance Company ("Peerless") is an insurance company authorized to transact business in Nevada and, on information and belief, has a principal place of business in Massachusetts.

27.     Cross-Defendant The Ohio Casualty Insurance Company ("Ohio Casualty" or "OCI") is an insurance company authorized to transact business in Nevada and, on information and belief, has a principal place of business in Massachusetts.

28.     Cross-Defendant West American Insurance Company ("West American" or "WAI") is an insurance company authorized to transact business in Nevada and, on information and belief, has a principal place of business in Massachusetts.

29.     Cross-Defendants OSI, Peerless, OCI, and WAI are related companies under the "Liberty"/Liberty Mutual insurance group and are referred to herein collectively as the "Liberty Defendants."

30.     The Trustee is currently unaware of the true names and capacities of DOES 1-50 and therefore sues those defendants by such fictitious names. The Trustee will amend this pleading to allege their true names and capacities when ascertained.

31.     This Court has subject-matter jurisdiction over this action because the amount in controversy exceeds $15,000, exclusive of interest and costs, and because this action seeks declaratory and injunctive relief in addition to money damages.

32.     Venue is proper in Clark County, Nevada because the underlying bodily-injury actions were filed and litigated in Clark County; the insurance claims and settlement decisions giving rise to this action were made and implemented in connection with litigation in Clark County; and the Policies were marketed, procured, and/or issued for risks located in Clark County, Nevada, including Real Water's Nevada operations and product distribution.

## FACTUAL BACKGROUND

### A.    Real Water's Business and the Re2al Alkalized Water Product

33.     Real Water was a Nevada-based company that manufactured and sold alkaline bottled water products. The company was founded by Brent Jones in 2008 and operated out of Clark County, Nevada. Real Water marketed its products as providing health benefits through a proprietary process that created "alkalized" and "negative ionized" water, claiming that this water could help consumers "move your body to an alkalized state by removing acid toxins" and "take in an abundance of antioxidant electrons to neutralize harmful free radicals."

34.     The key to Real Water's proprietary process was a substance called E2 Concentrate, which was manufactured through an electrolysis process and added to all Real Water products. The E2 Concentrate was a common ingredient added to every bottle of Real Water ever made, whether retail bottles or 5-gallon jugs.

35.     Real Water's products were distributed through a network of retailers and distributors, including grocery stores, convenience stores, and wholesalers. Those distributors and retailers later became defendants in many of the underlying bodily-injury cases simply by virtue of having sold Real Water's products.

### B.    The Insurance Policies

#### a.    The Liberty Defendants' Policies.

36.     From at least 2012 through 2020, the Liberty Defendants issued a series of primary commercial general liability ("CGL") and umbrella policies to Real Water providing coverage for

bodily-injury claims, including the product-liability claims asserted in the underlying litigation.

37.    Peerless issued four primary policies with policy number CBP1031766 (the "Peerless Primary Policies"); WAI issued two primary policies, with policy numbers  BKW (17) 56 93 29 40 and BKW (18) 56 93 29 40 (the "West American Primary Policies"); and OSI issued two primary policies, with policy numbers BLS (20) 59 96 11 64 and BLS (21) 59 96 11 64 (the "Ohio Security Primary Policies"). The "Peerless Primary Policies," "West American Primary Policies," and "Ohio Security Primary Policies" are collectively referred to herein as the "Primary Liberty Policies".

38.    Peerless issued policy numbers CU8899267, CU8899267, CU8899267, and CU8899267 (the "Peerless Umbrella Policies"); and OCI issued policy numbers USO (17) 56 93 29 40 and USO (18) 56 93 29 40 (the "Ohio Casualty Umbrella Policies"). The Peerless Umbrella Policies and the Ohio Casualty Umbrella Policies are collectively referred to herein as the "Umbrella Liberty Policies."

39.    The Liberty Policies were as follows:

| Policy Period | Policy Number |
| --- | --- |
| 2/4/12 – 2/4/13 | CBP1031766 (Commercial General Liability Policy) |
| 2/4/12 – 2/4/13 | CU889267 (Commercial Umbrella Coverage) |
| 2/4/13 – 2/4/14 | CBP1031766 (Commercial General Liability Policy) |
| 2/4/13 – 2/4/14 | CU889267 (Commercial Umbrella Coverage) |
| 2/4/14 – 2/4/15 | CBP1031766 (Commercial General Liability Policy) |
| 2/4/14 – 2/4/15 | CU889267 (Commercial Umbrella Coverage) |
| 2/4/15 – 2/4/16 | CBP1031766 (Commercial General Liability Policy) |
| 2/4/15 – 2/4/16 | CU889267 (Commercial Umbrella Coverage) |
| 2/4/16 – 2/4/17 | BKW (17) 56 93 29 40 (Commercial General Liability Policy) |
| 2/4/16 – 2/4/17 | USO (17) 56 93 29 40 (Commercial Umbrella Coverage) |
| 2/4/17 – 2/4/18 | BKW (18) 56 93 29 40 (Commercial General Liability Policy) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2/4/17 – 2/4/18          USO (18) 56 93 29 40 (Commercial Umbrella Coverage)

6/7/19 – 6/7/20          BLS (20) 59 96 11 64 (Commercial General Liability Policy)

6/7/20 – 12/1/20        BLS (21) 59 96 11 64 (Commercial General Liability Policy)

40.    The Primary Liberty Policies provide that Liberty was obligated to "pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies."

41.    The Liberty Primary CGL policies generally provided limits of $1,000,000 per occurrence and $2,000,000 general aggregate; the Liberty umbrella policies generally provided additional limits of $1,000,000 per occurrence and $1,000,000 aggregate (subject to terms, conditions, and retained limits).

42.    On information and belief, the aggregate limits across the Liberty policies were not less than $22,000,000 before payments; after early settlements paid in 2023, the remaining limits were claimed to be $21,500,000. The Liberty Defendants have taken, and continue to take, inconsistent positions on the amount and availability of limits, including advancing a "one occurrence" theory designed to reduce the limits available to protect the estates and its creditors.

43.    Liberty Defendants' policies granted the Liberty Defendants the right and duty to defend Real Water against suits seeking covered damages, and further granted the Liberty Defendants the contractual authority (and obligation when they assert control over the legal defense) to investigate and settle claims and suits. Here, that authority gave the Liberty Defendants complete control over case strategy including whether and how to use policy proceeds to resolve the underlying cases. The Liberty Defendants also had the obligation to pay any resulting covered judgments.

44.    Specifically, Liberty had the "right and duty to defend the insured against any "suit" seeking those damages." Liberty's duty and right to defend ceased when it had "used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C." Expressly, its "obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a.    [It] ha[s] used up the applicable limit of insurance in the payment of judgments or settlements; or

b.    The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

45.    It was Liberty's discretion whether it would "investigate any "occurrence" and settle any claim or "suit" that may result."

46.    The Liberty Defendants expressly agreed that "a person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but [Liberty] will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative."

47.    The Liberty Defendants policies also contained "Supplementary Payments" provisions requiring the Liberty Defendants to pay certain costs and interest in addition to limits, including (depending on the policy language) post-judgment interest on the full amount of judgments until Liberty Defendants paid, offered to pay, or deposited in court the portion within the applicable limits:

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend . . .

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

Importantly, the costs would "not reduce the limits of insurance." This contractual obligation alone has grown to be hundreds of millions of dollars.

. . .

**C.   The 2020 Outbreak, Government Investigation, Recall, and Business Collapse**

48.   Beginning in early 2010s and accelerating through 2019 and 2020, consumers of Real Water allegedly suffered severe acute liver injuries after ingesting Real Water products. A cluster of cases in Southern Nevada, including pediatric liver failure cases, triggered public-health investigations and coordinated litigation.

49.   In late 2020 and early 2021, Nevada health officials identified an outbreak of acute non-viral hepatitis (liver injuries) among Real Water consumers. The outbreak was devastating and tragic: dozens of consumers suffered acute liver failures, individuals died and 5 or more children in the matter of days were airlifted to Salt Lake City for emergency treatment at Primary Children's Hospital, where some faced potential liver transplantation. Many victims suffered permanent liver damage that will affect them for the rest of their lives.

50.   The U.S. Food and Drug Administration ("FDA") initiated an investigation into Real Water and its related facilities. The investigation lasted from March 16, 2021 to April 7, 2021, and was documented in an Establishment Inspection Report dated May 4, 2021. The FDA's testing confirmed the presence of hydrazine in E2 Concentrate samples at levels of 1.33 to 1.75 mg/mL— levels that should have been zero. The FDA documented nine violations related to Real Water's failure to validate process controls, maintain records, and analyze samples.

51.   The FDA concluded that it "considers the firm's proprietary E2 alkaline mineral concentrate and the firm's finished bottled alkaline water to be adulterated" under the Food, Drug, and Cosmetics Act. Critically, the FDA found that "because the E2 alkaline mineral concentrate that is produced in Henderson is a common ingredient to all Real Water brand bottled water products at all manufacturing locations, all Real Water brand bottled water is considered adulterated."

52.   Eventually, the Real Water Debtors recalled Real Water based on the concerns identified by the FDA and the Nevada health officials.

53.   Following the FDA investigation, the FDA, through the Department of Justice, obtained a Consent Decree of Permanent Injunction dated May 31, 2021. The Consent Decree was signed by Brent Jones and Blain Jones on behalf of Real Water. Real Water ceased operations in

May 2021.

54.    Through the course of litigation, the Liberty Defendants caused the Real Water Debtors to concede that the electrolysis process used to create E2 Concentrate inadvertently produced hydrazine—a highly toxic compound commonly used as rocket fuel. Hydrazine is a known hepatotoxin (liver toxin) that the Liberty Defendants caused the Real Water Debtors to concede should never be present in any food or beverage product at any level.

**D.    The Underlying Bodily-Injury Actions in Clark County District Court**

55.    Beginning March 2021, numerous personal injury lawsuits were filed against Real Water and various distributors in the Eighth Judicial District Court, Clark County, Nevada. These cases alleged that Real Water's contaminated products caused severe liver injuries, liver failure requiring transplantation, and wrongful death. The injuries were catastrophic and life-altering.

56.    The major cases[1] included, but were not limited to:

   • *Gallagher v. Real Water*, Case No. A-21-834485-B

   • *Wren v. Real Water*, Case No. A-21-831169-B

   • *Hunwardsen v. Real Water*, Case No. A-21-831543-B

   • *Brown v. Real Water*, Case No. A-21-831776-B

   • *Henry v. Real Water*, Case No. A-21-844176-B

   • *Williams/Morales v. Real Water*, Case No. A-23-864391-B

57.    Consistent with their rights under the policies, the Liberty Defendants asserted control over the cases against Real Water under a reservation of rights. In that capacity, the Liberty Defendants selected and retained defense counsel, made all strategic decisions regarding the defense, controlled all aspects of litigation strategy, and directed all settlement decisions. Defense counsel represented both the insurers and the insured—creating a "dual representation" under Nevada law that imposed heightened duties on the Liberty Defendants.

58.    The dual representation created conflicts of interest between the Liberty Defendant's coverage positions and Real Water's interests in liquidating claims and settlement.

---

[1] The cases herein are listed individually, but may have been tried in consolidated or coordinated trials.

Those conflicts were heightened because (i) the Liberty Defendant's exposure to paying limits could be reduced through coverage litigation; while (ii) Real Water's interests required prompt and reasonable settlement to avoid excess judgments, interest and fee awards.

59.    In addition, in each of the cases, the plaintiffs likewise brought claims against distributors and retail sellers of Real Water, including Costco Wholesale Corporation, Albertson's LLC, WINCO Foods, LLC, KeHE Distributors of Nevada LLC, Silver Springs Water Inc., and other retailers and wholesalers who sold or delivered Real Water products. Under the law, each could be jointly and severally liable for injuries to the plaintiffs. Upon information of the belief, the Insureds also provided a defense to other retailers, distributors and wholesalers.

60.    Given the potential exposure and their solvency, many of the retailers and wholesalers settled their claims with plaintiffs, and have asserted contribution claims in the Real Water Debtors bankruptcies. Upon information and belief, the amounts paid by the retailers, wholesalers and distributors are collectively in excess of several hundreds of millions of dollars.

**E.    Real Water's Chapter 7 Bankruptcy and the Stay-Relief Stipulations**

61.    On August 19, 2021, Real Water filed Chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the District of Nevada. The Bankruptcy Cases confirmed what was already clear: Real Water had no meaningful assets to pay tort claimants outside of insurance proceeds.

62.    Upon his appointment, the Trustee became the estate fiduciary. The Trustee was vested with the exclusive authority to control the estate, divesting prior management of any control. Consistent with that authority, the Trustee was the owner of the Real Water Debtors' privilege and was the "client."

63.    The Bankruptcy estates, through the Trustee, also owed a fiduciary duty to legitimate victims of the mass tort claims and expected (and understood) that the Liberty Defendants would use the proceeds of the estates insurance policies to pay victims.

64.    The filings of the Chapter 7 bankruptcy petitions on August 19, 2021, also triggered automatic stays under 11 U.S.C. § 362, which prevented the personal injury plaintiffs from moving forward with their claims against the Debtors.

65.     Beginning in September 2021, claimants negotiated stipulations with the Bankruptcy Trustee to lift the automatic stays and allow the personal injury litigation to proceed. These stipulations contained critically important language that would shape the Liberty Defendants' duties for the remainder of the litigation: "*In the event that an adverse judgment or other adjudication or determination of any liability of the Debtor is made arising out [of] the litigation, the Claimants will look solely to the Debtor's insurance coverage, if any, for any recovery for their alleged claims and damages.*"

66.     From September 2021 forward, the Liberty Defendants had actual, express, documented knowledge of the fact Real Water was in bankruptcy and that strategic settlement within policy limits was the ONLY way to protect any party from catastrophic exposure.

67.     Rather than diminishing the Liberty Defendants' duty to settle, these stipulations heightened that duty. When an insurer in these circumstances understands the insureds financial condition and the nature of the claims, the insurer's responsibility to settle strategically becomes paramount. And the insurer's exposure to bad faith liability is increased because the insurer knows the implications regarding any excess judgment.

68.     Those stay-relief stipulations and orders placed the Liberty Defendants on actual notice; and the Liberty Defendant's settlement decisions would determine whether victims would be paid or left with uncollectible judgments.

69.     The Liberty Defendants nevertheless failed to implement reasonable strategy to resolve claims within available insurance. Instead, the Liberty Defendants acted in their own interests and implemented a strategy to allow billions of dollars of claims to be established against Real Water while attempting at all points in time to minimize their own liability.

70.     The Liberty Defendants also failed to keep the Trustee reasonably apprised of settlement opportunities, evaluation decisions, and strategic litigation choices—despite knowing that the Trustee, as the estate representative and fiduciary to its creditors, had ultimate responsibility for protecting the estates creditors and managing the claims process.

71.     At the same time, the Liberty Defendants were receiving frequent updates from the Real Water Debtors' counsel, each of which apprised the Liberty Defendants of likely calamitous

judgments and were receiving legal advice from the same counsel regarding coverage. The extent and nature of the reports is under investigation, however, preliminary discovery reveals that the Liberty Defendants were aware that the failure to resolve claims would likely resolve in hundreds of millions of dollars in excess judgment.

**F.    Nevada Law Required Liberty Defendants to Give Equal Consideration to Real Water's Interests and to Settle When Liability Was Reasonably Clear**

72.    Under Nevada law, an insurer that controls settlement must give equal consideration to the insured's interests and must accept reasonable settlement opportunities within policy limits when liability is reasonably clear and the likely judgment will exceed limits.

73.    This duty arises from the implied covenant of good faith and fair dealing and is particularly critical where, as here, the insurer has assumed the defense and controls the policy funds, leaving the insured unable to settle without the insurer's consent.

74.    Nevada recognizes that an insurer's unreasonable failure to settle exposes the insurer to liability for the full amount of the resulting excess judgment, as well as consequential damages, attorneys' fees, and potentially punitive damages.

75.    In a multi-claimant "burning limits" scenario—where aggregate limits may be insufficient to pay all claims—reasonable insurer conduct requires prompt evaluation, communication with the insured, and implementation of a fair settlement and allocation plan, including seeking court guidance or filing interpleader early enough to prevent predictable excess exposure. Aggregate limits are not a license for paralysis.

76.    Here, the Liberty Defendants ignored those duties. They had the ability to resolve high-value cases within limits, to develop a rational allocation plan as more claims accrued, and to seek court guidance before catastrophic verdicts were entered. They did none of those things.

## LIBERTY DEFENDANTS' COURSE OF CONDUCT

**A.    The Liberty Defendants legally impermissible position on settlement.**

77.    Early in the underlying litigation, the Real Water Debtors received offers of judgment from the personal injury plaintiffs. The offers of judgment were within both single occurrence and aggregate policy limits. Moreover, the Liberty Defendants asserted control over

the decision whether to accept the Offers of Judgment, without consultation or input from the Trustee.

78.     The Liberty Defendants accepted and paid certain OOJs and settlements, demonstrating that settlement payments were legally permissible notwithstanding the bankruptcy and the Liberty Defendants had the ability to fund settlements from available insurance proceeds. The acceptance of these offers, both in quality and amount, demonstrate that the Liberty Defendants appreciated the liability and that it was their obligation to accept reasonable settlement offers.

79.     The Liberty Defendants acceptance and payment of OOJ, however, was peculiar. For instance, the Trustee's initial investigation reveals that the Liberty Defendants favored certain plaintiff's counsel, or more aptly disfavored others. Furthermore, despite accepting other OOJs, and in some cases, it is believed that the Liberty Defendants refused to pay the judgment unless and until the plaintiffs agreed to a separate release that benefited the Liberty Defendants. In other words, despite making the decision that the Real Water Debtors would accept an OOJs, the Liberty Defendants attempted to leverage the payment on a release—a demand that's neither contemplated nor relevant to NRCP 68—and would refuse to pay until one was received.

80.     Thereafter, the Liberty Defendants changed tact and have asserted that they cannot accept and/or cannot pay accepted OOJs. Recently, the Liberty Defendants have even argued to the United State District Court, in this very matter, that the payment of the OOJs would violate the automatic stay and that the OOJs—which the Liberty Defendants directed be signed, were void ab initio. The Liberty Defendants' changing position are further evidence of bad faith.

81.     Those early settlements show that Liberty Defendants' later claims of "inability" to settle were pretextual. The Liberty Defendants knew how to settle cases within the bankruptcy framework, and they did so—until they chose not to.

82.     In or around 2023, the Liberty Defendants pursued a strategy of litigating coverage defenses and attempting to force a global settlement through the bankruptcy process rather than resolving cases individually or through a fair allocation plan. This approach served the Liberty Defendants' interests by delaying payments and preserving the ability to reduce or avoid coverage

1    through declaratory relief.

2        83.    After the Bankruptcy Court denied a proposed settlement agreement between the

3    Trustee and the Liberty Defendants, the Liberty Defendants shifted their strategy. The failed

4    settlement and diverging strategy created another unwaivable conflict.

5        84.    Coincidingly, the Liberty Defendants filed a declaratory relief action in bankruptcy

6    court seeking, among other things, rulings that (i) all claims constituted a single "occurrence" (to

7    reduce available limits), (ii) certain policy years were not triggered (to limit expected coverage),

8    (iii) alleged cooperation clause issues that vitiated coverage, and (iv) seeking a declaration punitive

9    damages and attorneys' fees were excluded.

10        85.    Despite now outwardly taking positions that created actual conflicts, the Liberty

11    Defendants have never provided Real Water with independent counsel and have never disclosed

12    the nature and extent of the actual conflict that exists.

13        86.    While the Liberty Defendants pursued the position that they had no coverage

14    obligation, the plaintiffs continued to prosecute cases in state court under stay-relief stipulations.

15    The Liberty Defendants knew trials were approaching and that their failure to settle would result

16    in verdicts far beyond limits.

17        87.    Yet, rather than settle claims, the Liberty Defendants instead caused the Real Water

18    Debtors to admit liability, ensuring judgments well in excess of plaintiffs' prior settlement offers.

19    **B.    Real Water's liability was known to the Liberty Defendants, and they caused
         Real Water to concede liability.**
20

21        88.    From the outset, the Liberty Defendants were aware of the FDA and Nevada Health

22    Districts findings with respect to Real Water. Additionally, experts retained by Real Water, as well

23    as the personal injury plaintiffs, confirmed what was suspected, at least some Real Water contained

24    hydrazine.

25        89.    By 2023, the Liberty Defendants made the strategic choice that the Real Water

26    Debtors should make sweeping admissions of liability in multiple underlying cases, including

27    admissions that Real Water manufactured and sold a defective product and that the defective

28    product caused plaintiffs' injuries. The decision was made without consulting the Trustee.

90.    The Liberty Defendants knew that, once liability and causation were admitted, the only remaining issue was the magnitude of damages, which in these catastrophic liver-injury cases presented extreme risk of runaway verdicts and punitive awards. The Liberty Defendants' decision was calamitous and guaranteed that any jury verdict would result in excess liability to the Real Water Debtors.

91.    On August 30, 2023—two judicial days before the first trial in *Gallagher*—Real Water, through defense counsel selected, retained, and controlled by the Liberty Defendants, unilaterally admitted liability and causation for all plaintiffs' injuries. This admission was formalized in a written stipulation entered on October 4, 2023, which stated:

> *"The Real Water Debtors admit that they manufactured and sold a defective product (Real Water), and that their defective product (Real Water) caused the injuries asserted by each Plaintiff that gave rise to Plaintiffs' claims in the instant action. The Real Water Debtors admit to liability and causation for each Plaintiff's alleged injuries only, and they reserve the right to contest the amount of Plaintiffs' claimed damages."*

92.    Defense counsel made additional damning admissions in open court. At the *Gallagher* trial before the jury, defense counsel stated:

> *"I wanted to get a couple of things out of the way to start off with our opening statement. **Drinking Real Water made people sick**. Drinking Real Water made these plaintiffs sick. That is not contested in this case, okay. **Drinking Real Water caused Kathleen Ryerson's premature death**. That's also not contested in this case."*

93.    Defense counsel further told the jury: "**There should not have been one drop of hydrazine in Real Water. That is undisputed and indefensible**." And: "Real Water doesn't need a hydrazine expert... Real Water has adopted the opinions of Dr. Najm. They agree with him."

94.    After the Liberty Defendants directed Real Water's counsel to admit liability in *Gallagher*, the jury predictably entered a verdict in excess of $100,000,000, which was many multiple times greater than the last rejected settlement offers, all of which were within policy limits. In fact, in light of the disclosed medical damages and nature of the injuries, it was impossible that the Real Water Debtors could obtain a better outcome than the settlement offers, something the Liberty Defendants knew and something that could not even be argued for at trial. In other words, there was literally no upside in going to trial and any decision to do so was in bad

faith and designed purely to draw out the proceedings and create coverage defenses, especially in light of the admission of liability.

95.     The admissions of liability were so profound because they went beyond merely admitting that one plaintiff was injured by tainted water. Instead, the Liberty Defendants caused the Real Water Debtors to admit that all of Real Water's products were tainted. The distinction is one with a great difference.

96.     Similar admissions were made in subsequent trials—*Hunwardsen*, *Wren*, and *Brown*. And in October 10, 2024, Judge Williams entered summary judgment in the *Williams/Morales* case based on issue preclusion, finding that "*no genuine dispute that all Real Water products... contained hydrazine*" and were "**defective and unreasonably dangerous**." Then in December 2025, Judge Hardy similarly entered summary judgment against both Real Water and other distributors and wholesalers.

97.     Specifically, in other cases (as well as in *Gallagher*), there were questions of fact as to whether a specific Real Water product consumed by a plaintiff contained hydrazine. While hydrazine was found in certain bottles of water, that is different from hydrazine being found in every ounce of Real Water produced. However, based on the Liberty Defendants' direction to Real Water's counsel, the Liberty Defendants' eliminated the distinction, meaning that any future plaintiff only had to prove that they drank Real Water and that they suffered an injury.

98.     In subsequent cases, the Liberty Defendants directed Real Water's counsel to change position and to even retain experts to combat what they had already admitted. In those cases, Real Water attempted to argue that all Real Water did not contain hydrazine. However, the prior admissions were insurmountable and summary judgment was entered against Real Water.

99.     This has proven even more troublesome as Courts throughout Nevada have adopted the admissions and entered summary judgment against Real Water's retailer sellers, distributors and wholesalers, which have resulting in significant third-party contribution claims in the bankruptcy.

100.    The implications of these admissions and a bellwether judgment for the Liberty Defendants' settlement duty were profound and immediate:

a.    Every trial was guaranteed to result in a plaintiff verdict on liability;

b.    Every verdict would exceed tens of millions of dollars;

c.    No reasonable basis existed to reject settlement offers within policy limits;

d.    Settlement became not just advisable but mandatory under Nevada law; and

e.    Every offer rejected after the admission exposed the insured to excess liability.

101.    Once the Gallagher verdict was entered and the Insureds had caused the Real Water Debtors through counsel to admit liability, the Liberty Defendants had no excuse or valid basis to reject any additional settlements offers. Yet, the Liberty Defendants continued rejecting every settlement offer.

102.    Between the October 2023 admission and late 2025, the Liberty Defendants received and rejected dozens of additional offers within policy limits. This conduct is inexplicable under any legitimate reading of an insurer's duties.

103.    Moreover, the Liberty Defendants directed defense counsel to continue making these admissions while the Liberty Defendants were simultaneously pursuing coverage defenses under their reservation of rights.

104.    This includes the Liberty Defendants filing an adversary proceeding in bankruptcy court seeking declaratory relief on multiple coverage issues. The relief sought included:

a.    Declaration that only one "occurrence" existed (to limit available coverage to a single per-occurrence limit);

b.    Declaration that 2012-2016 policies were not triggered (to eliminate millions in coverage);

c.    Declaration that cooperation clauses were breached (to void all coverage entirely);

d.    Declaration that punitive damages and attorneys' fees were excluded from coverage.

105.    This litigation reveals the Liberty Defendants' **true priorities** all along: they intended on litigating coverage defenses rather than settling claims. This created a fundamental conflict of interest:

**Liberty Defendants' interest**: Pay less or no money by winning coverage litigation.

**Real Water's interest**: Settle claims within limits to avoid catastrophic excess exposure.

106.    Nevada law is clear: when such a conflict exists, the insurer must resolve it in favor of the insured. An insurer may not refuse to settle within policy limits in order to create leverage in coverage disputes or to avoid paying valid claims. The Liberty Defendants did the opposite—they pursued their own financial interests while settlement opportunities expired and verdicts accumulated.

107.    Most egregiously, the Liberty Defendants continued defending the underlying litigation for years while knowing that total liability vastly exceeded all available coverage. With approximately $21.5 million in coverage and exposure running into the billions, Liberty Defendants' only reasonable option was strategic settlement to minimize excess exposure. Instead, they continued to trial repeatedly, pursuing meritless coverage defenses while watching verdict after verdict enter against their insured. This is the essence of gambling with the insured's money.

108.    To that end, the Liberty Defendants were willing to have their insured admit complete liability—eliminating all trial defenses and guaranteeing plaintiff verdicts—while reserving the right to later deny coverage based on those same admissions. This created an irreconcilable conflict of interest: the Liberty Defendants were prejudicing their insured's interests to preserve their own coverage defenses.

109.    Additionally, by admitting liability and failing to properly develop a defense, including adducing exculpatory evidence regarding the presence of hydrazine in different containers, the Liberty Defendants have all but assured that summary judgment will be entered against the Real Water Debtors in all future proceedings. Additionally, as new cases have arisen, with causation and liability defendants, the Liberty Defendants' decisions have foreclosed or estopped the Real Water Debtors from asserting defenses or challenging liability.

110.    Similarly, by admitting the liability, the manufacturers and distributors of Real Water are likewise subject to increased strict liability, including large compensatory damages. While these claims are largely settled, the manufacturers and distributors possess contribution claims in the bankruptcy case, which have increased in size based on the Liberty Defendants failure

to settle claims.

111.    As of January 2025, five major trials have resulted in verdicts against Real Water. The results are devastating and amount to more than $8,000,000,000 in direct judgments against Real Water:

- *Gallagher* case (November 1, 2023): $30,418,750.41 compensatory + $200,000,000 punitive = $231,200,000

- *Hunwardsen* case (April 16, 2024): $30,985,836.89 compensatory + $100,000,000 punitive = $132,874,962

- consolidated *Wren* cases (September 4, 2024): $93,474,832.42 compensatory + $3,000,000,000 punitive = $3,104,748,608

- consolidated *Brown* cases (January 24, 2025): $ 236,405,861.91 compensatory + $5,000,000,000 punitive = $5,108,800,000

- consolidate *Chang* cases (July 16, 2025): $95,071,447.32 compensatory + $3,000,000 punitive

112.    In addition, there are hundreds of millions in contribution claims to be asserted by distributors and wholesalers.

113.    After the deluge of judgments and questions were raised about the Liberty Defendants bad faith by the trustee, the Liberty Defendants later attempted to distance themselves from the consequences (including the billions of dollars of damages) of those admissions by advancing coverage defenses based on alleged "intentional" conduct, alleged "expected or intended" injury, alleged cooperation-clause breaches, and other defenses that the Liberty Defendants themself helped manufacture through their control of the defense.

114.    The Liberty Defendants conduct created a classic and disqualifying conflict of interest: the Liberty Defendants controlled the defense under reservation of rights while steering the litigation in a manner that increased Real Water's exposure and potentially supported Liberty Defendants' future coverage positions. Nevada law does not permit an insurer to gamble with its insured's exposure to serve the insurer's coverage agenda.

. . .

**C.    Liberty Defendants Rejected or Ignored a Wave of NRCP 68 Offers of Judgment That Were Reasonable and Within Available Coverage**

115.    The Liberty Defendants' response to OOJs have been inconsistent and erratic, all of which are emblematic of their bad faith. For instance, in 2023, two OOJs were accepted by the Liberty Defendants in the Gallagher case, both without the Trustee's approval.  Then, after a proposed settlement with the Trustee, the Liberty Defendants filed an interpleader action and claimed they were prohibited from accepting or paying OOJs. However, it is believed that they in fact accepted and paid certain OOJs during the pendency of the original interpleader action. Thereafter, the Liberty Defendants once again changed their position, accepting OOJs, but refusing to pay on the OOJs on the basis that the payments exceeded potential coverage. In fact, the position changed to expressly benefit the Liberty Defendants' own interest.

116.    In total, between May 2023 and January 2025, Real Water received approximately fifty (50) offers of judgment under Nevada Rule of Civil Procedure 68. These offers ranged from $250,000 to $2,000,000 per plaintiff, with most offers falling between $425,000 and $975,000— well within the $1,000,000 per-occurrence policy limits. The total amount offered exceeded $25,000,000—only slightly more than the available policy limits of approximately $21.5 million. However, in context, the combined OOJs were less than a single jury verdict (or the ordered attorney's fees).

117.    The Liberty Defendants**,** without informing or seeking guidance from the Trustee, made all decisions with respect to accepting, rejecting or paying the OOJs. Over a period of more than 18 months, while liability was admitted, while verdicts were entering, while exposure was growing by billions of dollars, the Liberty Defendants refused to accept almost any settlement offer from any plaintiff. This pattern of complete rejection demonstrates conscious, deliberate bad faith—not mere negligence or poor judgment.

118.    Because the offers of judgment were typically structured to be inclusive of costs, attorneys' fees, and interest, they presented the Liberty Defendants with repeated opportunities to cap exposure and avoid the very fee awards and interest that NRCP 68 imposes as mandatory penalties for unreasonable rejection.

119.    The Liberty Defendants rejected virtually every offer, failed to implement a reasonable allocation plan to accept the most urgent or highest-risk offers, did not seek timely court guidance for allocation, and did not file interpleader early enough to prevent predictable excess exposure.

120.    The Liberty Defendants' refusals were not the product of a careful and fair plan. They were the product of delay, inaction, and coverage-driven motives that placed the Liberty Defendants' interests above those of their insured and the bankruptcy estates.

121.    The following examples demonstrate the catastrophic consequences of the Liberty Defendants' refusals to settle, based on compensatory damages alone:

> • Christopher Noah Wren: Offer of $970,000 → Verdict of $11,309,788 → Excess of $10,339,788
>
> • Christopher B. Wren: Offer of $475,000 → Verdict of $7,298,820 → Excess of $6,823,820
>
> • Emely Wren: Offer of $250,000 → Verdict of $6,055,000 → Excess of $5,805,000
>
> • Ryan Carrier: Offer of $975,000 → Verdict of $2,418,151 → Excess of $1,443,151
>
> • Trevor Abele: Offer of $975,000 → Verdict of $17,539,294 → Excess of $16,564,294
>
> • Myles Hunwardsen: Offer of $1,000,000 → Verdict of $24,308,244 → Excess of $23,308,244
>
> • Tiquionte Henry: Offer of $975,000 → Verdict of $83,745,103 → Excess of $82,770,103

122.    For these eight plaintiffs alone, the Liberty Defendants could have settled for less than $6,000,000. Instead, verdicts totaled more than $150,000,000. The insurers gambled with their insured's money and lost catastrophically, causing liability of more than 25 times the settlement offers rejected.

. . .

123.    Each of these verdicts was preceded by repeated settlement opportunities that the Liberty Defendants refused to accept. The Liberty Defendants refusal to accept those offers triggered mandatory penalties under NRCP 68 and NRS 17.117, including post-offer attorneys' fees, costs, expert fees, and prejudgment interest. These penalties predictably multiplied the exposure beyond what the verdict amounts alone would have been.

124.    Under Nevada Rule of Civil Procedure 68, a defendant who rejects an offer of judgment and then receives a less favorable verdict at trial must pay the offeror's post-offer attorneys' fees and costs. On June 17, 2025, Judge Hardy entered a landmark order in the *Wren* case making specific findings about the Liberty Defendants' conduct.

125.    Judge Hardy found that the Liberty Defendants' rejection of the Wren plaintiffs' offers of judgment was "grossly unreasonable and/or in bad faith." This judicial finding—made by the trial judge who presided over the case and observed the Liberty Defendants' conduct firsthand—provides powerful evidence for this bad faith action.

126.    Critically, the court rejected the argument that bankruptcy proceedings and/or limited insurance constituted good faith justification for rejecting reasonable OOJs and proceeding to trial. These findings go directly to the reasonableness of the Liberty Defendants' settlement conduct and will be used by the Trustee as evidence of the Liberty Defendants' bad faith failure to settle and failure to protect Real Water from avoidable fee-and-interest exposure.

127.    Judge Hardy awarded the following fees and interest in the *Wren* case alone:

• Attorneys' fees on compensatory damages: $41,899,443

• Attorneys' fees on punitive damages: $1,200,000,000

• Prejudgment interest on future damages: $4,609,217

• Prejudgment interest on punitive damages: $333,098,925

TOTAL WREN FEES AND INTEREST: $1,579,607,585

128.    Similar fee applications are pending in the other cases. Plaintiff estimates total NRCP 68 fee exposure across all cases at over $1.5 billion. These attorneys' fee awards are a direct consequence of the Liberty Defendants' bad faith—they would not exist if the Liberty Defendants had accepted the reasonable settlement offers within policy limits.

1

**D.    The Liberty Defendants Accepted Certain Offers of Judgment but Failed to Timely Pay, Causing Additional Judgments and Interest.**

2

3    129.    While the Liberty Defendants have argued that they were "unable" to accept offers

4    of judgment due to the pending bankruptcy, the position is absurd.

5    130.    In what constitutes the clearest and most damning evidence of willful bad faith, the

6    Liberty Defendants unilaterally accepted OOJs (without trustee input) and then deliberately

7    refused to pay them. This conduct goes beyond negligence, beyond poor judgment, beyond even

8    ordinary bad faith—it constitutes willful, intentional breach of settlement obligations.

9    131.    The pattern is documented in the complaint filed by Plaintiff. On April 3, 2025, Ms.

10    Aleksander served an offer of judgment for $250,000. On April 17, 2025, Real Water—through

11    its insurer-appointed defense counsel—accepted the offer, creating a binding settlement agreement

12    under Nevada law. The Liberty Defendants then refused to pay.

13    132.    When confronted about the non-payment on June 8, 2025, the Liberty Defendants'

14    counsel made an astonishing admission that reveals their deliberate bad faith strategy. Counsel

15    stated that the accepted offer would be reduced to judgment under NRCP 68(d)(3) and that the

16    Liberty Defendants "would let it go to judgment and still not pay." This statement is dispositive

17    evidence of willful misconduct—the Liberty Defendants admitted they would deliberately refuse

18    to honor their settlement obligations that they undertook on behalf of the Real Water Debtors

19    regardless of consequences. Since that time, the Liberty Defendants have gone so far as to argue

20    that an Insurer is not obligated to pay an OOJ, that the OOJ's are obligations of the Real Water

21    Debtors, and that the OOJs were void because they violated the automatic stay. Each of these

22    arguments is frivolous and evidence of the Liberty Defendants' bad faith.

23    133.    The following offers were accepted by the Liberty Defendants but never paid:

24        • Agnes Aleksander - $250,000 accepted April 17, 2025 - NOT PAID

25        • Keith Haley - $250,000 accepted May 5, 2023 - Payment "attempted" then refused

26        • Cindy Jones - $450,000 accepted February 24, 2025 - NOT PAID

27        • Kristina Allan - $385,000 accepted May 8, 2025 - NOT PAID

28        • Grace Zimmerman - $1,000,000 accepted May 8, 2025 - NOT PAID

• Robert McGovern - $1,000,000 accepted May 8, 2025 - NOT PAID

• Allon Adar-Burla - $325,000 accepted April 3, 2025 - NOT PAID

• Catherine Britton - $650,000 accepted April 3, 2025 - NOT PAID

134.    In the Adar-Burla matter, it is alleged that the Liberty Defendants expressly requested that the plaintiff make an OOJ in a certain amount and that it would be paid. After the plaintiff did so, the Liberty Defendants refused to pay, claiming that it was the Real Water Debtors' obligation to pay the OOJ not the Liberty Defendants. They then forced Adar-Burla to sue the Liberty Defendants.

135.    Accepted OOJs are binding and result in valid enforceable judgments under Nevada law against the offeror (here, Real Water). The Liberty Defendants' failure to pay accepted OOJs forced the plaintiffs to incur additional attorneys' fees to enforce settlements and required the estates to address additional litigation and judgment-administration issues in state court and bankruptcy court.

136.    The Liberty Defendants failure to timely pay some or all of these accepted OOJs, necessitated entries of judgment and further litigation. The Liberty Defendants nonpayment also violated the Policies' promises to pays sums the insured becomes legally obligated to pay and to pay supplementary interest obligations.

137.    The Liberty Defendants pattern of selective payment—paying certain early settlements while refusing or delaying others—reflects claims-handling practices designed to preserve Liberty Defendants' strategic position rather than to protect the insured's interests and are evidence of bad faith.

**E.    The Liberty Defendants Actions Triggered Massive Post-Judgment Interest and Supplementary Payment Obligations, Including Interest on Punitive Damages**

138.    Nevada law provides that civil judgments accrue post-judgment interest at the rate specified by NRS 17.130. This interest accrues on the full amount of judgment from the date of entry until satisfied.

139.    The Liberty Defendants Policies also contain "Supplementary Payments" provisions addressing interest. In many standard-form CGL policies, the Liberty Defendants

promised to pay: (i) prejudgment interest "**on that part of the judgment we pay**," and (ii) "**all interest on the full amount of any judgment**" that accrues after entry and before the Liberty Defendants have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limits.

140.    The distinction between those provisions is critical. The post-judgment interest provision uses broad language—"all interest on the full amount of any judgment"—and is not limited to covered damages. The Liberty Defendants drafted the Policies and could have used limiting language, as they did in the prejudgment interest provision, but chose not to.

141.    The Liberty Defendants' obligation to pay **all** post-judgment interest, even on those potentially uncovered portions of the judgment, is rooted in their good faith obligations and particularly important in situations where the Liberty Defendants had the exclusive right to control the settlement of claims and chose not to do so within policy limits. In controlling the decision to settle matters, the Liberty Defendants were unilaterally taking action that could subject their insureds to additional liability and post-judgment interest if the Liberty Defendants did not successfully defend the claims. In other words, they contractually agreed to assume the risk of not settling a claim within the policy limit.

142.    As a result, the Liberty Defendants delay in paying, offering to pay, or depositing limits caused interest to accrue on the full amounts of judgments, including punitive damages, attorneys' fees, and costs. Those interest obligations are separate contractual duties that do not erode limits and are also recoverable as consequential damages of Liberty Defendants' bad faith.

143.    The rationale behind such a provision is illustrated here. As discussed above, the Liberty Defendants had numerous opportunities to settle claims for less than a million dollars and within policy limits. When the Liberty Defendants chose not to, not only did they subject the Real Water Debtors to billions in liability, but they subjected them to post-judgment interest on the judgment, which amounted to millions of dollars **per day** in interest. The Liberty Defendants agreed that they would not subject the Real Water Debtors to post-judgment interest based on the Liberty Defendants incorrect and reckless settlement decisions.

. . .

144.    The Liberty Defendants are (and were) aware that each day of delay increased interest exposure, yet they continued to delay settlement and payment, multiplying the harm to Real Water and its bankruptcy estates. Currently, post-judgment interest is in excess of several million dollars per day and payable to the Real Water Debtors by the Liberty Defendants.

**F.    Distributors and Retailers Were Forced to Settle and Are Asserting (or Will Assert) Contribution and Indemnity Claims in the Bankruptcy Cases.**

145.    Real Water distributed its products through numerous wholesalers, distributors, and retailers (collectively, "Distributors"). When consumers were injured, plaintiffs routinely sued Distributors alongside Real Water under strict-liability and chain-of-distribution theories.

146.    Many Distributors faced independent exposure and defense costs and were forced to fund settlements with injured plaintiffs to avoid trial risk and to protect their businesses.

147.    Because Real Water was insolvent, Distributors who paid settlements have asserted, formally and informally, and/or will assert, contribution and/or indemnity claims against Real Water's bankruptcy estates. Such claims include claims by and among entities such as Costco Wholesale Corporation, Albertson's LLC, WINCO Foods, LLC, KeHE Distributors of Nevada LLC, Silver Springs Water Inc., and other retailers and wholesalers who sold or delivered Real Water products.

148.    These contribution claims are direct, foreseeable consequences of the Liberty Defendants' failures. If the Liberty Defendants had properly defended in the way they were obligated to do, or had settled high-value cases within limits and implemented a rational allocation plan, the chain-of-distribution defendants would have had less incentive or need to fund settlements, and the bankruptcy estates would face a materially smaller universe of contribution claims.

149.    The Trustee anticipates and understands that Distributors will continue to file proofs of claim in the Bankruptcy Cases seeking contribution for settlement amounts, defense costs, and attorneys' fees. Those claims harm the estates and reduce recovery for other creditors.

150.    As a result, the Trustee seeks damages from the Liberty Defendants for the consequential increase in bankruptcy claims and costs caused by the Liberty Defendants' bad faith

and unfair claims practices.

**G.    The Failed Bankruptcy Settlement Strategy and an Untimely Interpleader.**

151.    The timeline of the Liberty Defendants failed bankruptcy settlement strategy demonstrates its unreasonableness and intent.

152.    Rather than accept reasonable settlement offers made by the Plaintiffs, the Liberty Defendants made the strategic decision to attempt to eliminate their liability through the purchase of the insurance policies from the estate. In effect, by paying the bankruptcy estate, the Liberty Defendants proposed that their liability and obligation to defend the personal injury actions or pay any judgment would be completely eliminated, all while keeping the Trustee in the dark about the unprecedented wave of liability they were and would purposefully send crashing over the estates. However, any such proposal would have to be accepted by the bankruptcy court and approved through what is known as a 9019 motion.

153.    On July 28, 2023, the Bankruptcy Trustee filed its initial settlement motion (9019 Motion).  The Court rejected the settlement proposal.

154.    On December 11, 2023, a Revised 9019 Motion was filed, which was similarly rejected by the Bankruptcy Court.

155.    Apparently certain that the 9019 motions would be granted and their liability would be limited, the Liberty Defendants make the above decisions to concede liability and effectively reject all reasonable settlement offers. The decision was calculated and led to billions in excess judgment.

156.    In essence, fifteen months were wasted on a strategy that ultimately failed, while over $8.4 billion in verdicts accumulated. During this entire period, the Liberty Defendants had the option to settle individual claims within their limits. They chose not to.

157.    On August 9, 2024—while still awaiting the bankruptcy court's decision on the failed 9019 Motion— the Liberty Defendants filed an interpleader action seeking to deposit approximately $21.5 million with the Court, extinguish the Liberty Defendants' liability, and foreclose any bad faith claims held by Real Water or the Plaintiffs. The bankruptcy court ultimately found it lacked jurisdiction to resolve the claims.

158.    On March 5, 2025, the Liberty Defendants filed a new interpleader in federal district court. While it named the Real Water Debtors parties, it failed to obtain stay relief. In addition, the interpleader came too late.

159.    By March 2025, the Liberty Defendants abject bad faith had already resulted in dozens of rejected settlements and existential judgments against Real Water:

a.    Five verdicts totaling $8.4 billion had already been entered;

b.    NRCP 68 attorneys' fees exceeding $1.5 billion had accrued;

c.    Post-judgment interest was accruing at $2.2 million per day;

d.    Claimants' settlement offers had long since expired; and

e.    Real Water faced catastrophic, permanent, irreversible excess liability.

160.    the Liberty Defendants should have filed interpleader in 2023 when it became clear that offers exceeded policy limits and the Liberty Defendants were unwilling to develop any settlement strategy. Instead, they wasted 18+ months pursuing a failed bankruptcy settlement strategy (seemingly designed to victimize plaintiffs) while allowing verdicts to accumulate. The late interpleader does not excuse their prior bad faith—it confirms it.

## HARM TO THE BANKRUPTCY ESTATES

161.    The Liberty Defendants conduct has caused and continues to cause substantial harm to the Real Water Debtors bankruptcy estates, including but not limited to:

a.    Excess judgments far beyond available policy limits, including punitive damages awards measured in billions of dollars;

b.    NRCP 68 and NRS 17.117 fee, cost, expert-fee, and prejudgment interest awards that were triggered solely by the Liberty Defendants' unreasonable rejection of OOJs;

c.    Ongoing post-judgment interest under NRS 17.130 and under the Policies' supplementary payments provisions, accruing daily until judgments are satisfied;

d.    Litigation expenses incurred by the Trustee and the estates in addressing coverage litigation, interpleader litigation, enforcement of accepted

settlements, and administration of judgments;

    e.     Failure to pay legitimate creditors of the bankruptcy estate for whom the Trustee owes a duty;

    f.     Increased proofs of claim and liabilities in the Bankruptcy Cases resulting from Distributor contribution and indemnity claims; and

    g.     Loss of estate value and bargaining power caused by the Liberty Defendants delay, refusal to pay, and strategic use of bankruptcy as an excuse for inaction.

162.    Because Liberty Defendants controlled Real Water's defense and settlement rights, their bad faith and unfair practices are a substantial factor and proximate cause of these harms.

## CLAIMS FOR RELIEF

### FIRST CROSS-CLAIM/COUNTERCLAIM

### (Declaratory Relief – Coverage, Settlement, Supplementary Payments, and Interest)

163.    The Trustee realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

164.    An actual and justiciable controversy exists between Plaintiff, the Trustee on behalf of the Real Water Debtors, and the Liberty Defendants regarding the Liberty Defendants' duties and obligations under the Policies and under Nevada law, including but not limited to the Liberty Defendants' duties to: (i) defend; (ii) indemnify; (iii) pay settlements and judgments; (iv) pay supplementary payments such as costs and interest; (v) act in good faith and give equal consideration to the insured's interests in settlement; and (vi) refrain from asserting coverage defenses that are waived, estopped, or otherwise forfeited by the Liberty Defendants' conduct.

165.    The Trustee seeks declarations that:

    a.     the Liberty Defendants owed and continue to owe Real Water duties of good faith and fair dealing in handling, defending, evaluating, and settling the Real Water Debtors bodily-injury claims;

    b.     the Liberty Defendants breached those duties by failing to accept reasonable settlement opportunities within the available policy limits, including

1     numerous NRCP 68 OOJs;

2          c.     the Liberty Defendants' breaches render them liable for the full amounts of

3                 excess judgments and consequential damages proximately caused by their

4                 conduct;

5          d.     Under the Policies' supplementary payment provisions, the Liberty

6                 Defendants owe post-judgment interest on the full amount of the judgments

7                 (including amounts exceeding limits and including punitive damages) to the

8                 Real Water Defendants from the date of entry until the Liberty Defendants

9                 paid, offered to pay, or deposited their portion within limits; and

10         e.     the Liberty Defendants are obligated to pay accepted OOJs and settlements,

11                and their failure to do so constitutes breach and bad faith.

12   166.    Further, the Trustee seeks a declaration that the Liberty Defendants are estopped

13   from denying coverage based on facts or positions created, directed, or materially influenced by

14   their own control of the defense, including admissions of liability and causation made by defense

15   counsel under the Liberty Defendants control and reservation-of-rights conflicts.

16   167.    The Trustee seeks such other declarations as the Court deems just and proper in

17   view of the facts established at trial.

18   **SECOND CROSS-CLAIM**

19   **(Breach of Contract – Failure to Pay Covered Judgments, Settlements, Supplementary**

20   **Payments, and Benefits)**

21   168.    The Trustee realleges and incorporates by reference each and every allegation

22   contained in the preceding paragraphs as though fully set forth herein.

23   169.    The Policies are valid and enforceable contracts between the Real Water Debtors

24   and Liberty Defendants (and/or contracts under which the Trustee, as estate representative, is

25   entitled to enforce the Debtors' rights).

26   170.    The Liberty Defendants breached the Policies in multiple ways, including but not

27   limited to:

28   . . .

Rejecting approximately fifty (50) offers of judgment that were within policy limits and represented reasonable valuations of the underlying claims;

b.      Accepting offers of judgment and then deliberately refusing to pay them;

c.      Prioritizing coverage litigation and their own financial interests over their insured's interest in avoiding excess exposure;

d.      Pursuing a failed bankruptcy settlement strategy for 15+ months while settlement opportunities expired and verdicts accumulated;

e.      Failing to develop any allocation strategy for their limited aggregate policy limits despite knowing offers exceeded those limits;

f.      Continuing to defend litigation for years while knowing total exposure vastly exceeded coverage;

g.      Filing interpleader too late to avoid catastrophic excess liability;

h.      Making a too-late settlement offer in January 2025 with conditions designed to ensure rejection;

i.      Selectively paying certain claimants while refusing to pay others with identical accepted offers;

j.      Directing defense counsel to admit liability while pursuing conflicting coverage defenses;

k.      Failing to inform and consult with the Chapter 7 Trustee regarding settlement decisions.

171.    As a direct and proximate result of the Liberty Defendants breaches, the Real Water Debtors' bankruptcy estates have suffered damages in an amount to be proven at trial, but no less than $8 billion, including policy benefits due, consequential damages, interest, attorneys' fees, and costs.

172.    The Trustee is entitled to recover damages for breach of contract, including prejudgment and post-judgment interest, attorneys' fees where permitted by statute or contract, and such other relief as the Court deems just.

## THIRD CROSS-CLAIM

**(Insurance Bad Faith – Failure to Settle Within Limits and Failure to Protect the Insured)**

173.    Cross-Claimant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

174.    The Liberty Defendants owed (and continue to owe) Real Water duties of good faith and fair dealing in claims handling and settlement, including the duty to give equal consideration to Real Water's interests when evaluating settlement opportunities and the duty to accept reasonable settlements within limits when liability was reasonably clear and the risk of an excess judgment was substantial.

175.    The Liberty Defendants breached those duties by, among other things: (i) failing to reasonably investigate and evaluate claims; (ii) failing to timely communicate and coordinate with the Trustee; (iii) refusing to accept reasonable OOJs and settlement opportunities; (iv) failing to develop or implement a fair allocation plan in a multi-claimant limited-limits environment; (v) delaying interpleader and tender until after catastrophic verdicts; and (vi) pursuing coverage-driven strategies (including "one occurrence" coverage litigation and reservation-of-rights conflicts) that placed Liberty Defendants' financial interests ahead of Real Water's interests.

176.    The Liberty Defendants further breached their duties by:

a.    Rejecting approximately fifty (50) offers of judgment that were within policy limits and represented reasonable valuations of the underlying claims;

b.    Accepting offers of judgment and then deliberately refusing to pay them;

c.    Prioritizing coverage litigation and their own financial interests over their insured's interest in avoiding excess exposure;

d.    Pursuing a failed bankruptcy settlement strategy for 15+ months while settlement opportunities expired and verdicts accumulated;

e.    Failing to develop any allocation strategy for their limited aggregate policy limits despite knowing offers exceeded those limits;

f.    Continuing to defend litigation for years while knowing total exposure vastly exceeded coverage;

g.    Filing interpleader too late to avoid catastrophic excess liability;

h.    Making a too-late settlement offer in January 2025 with conditions designed to ensure rejection;

i.    Selectively paying certain claimants while refusing to pay others with identical accepted offers;

j.    Directing defense counsel to admit liability while pursuing conflicting

1      coverage defenses;

2      k.      Failing to inform and consult with the Chapter 7 Trustee regarding
3              settlement decisions.

4      177.    As a direct and foreseeable result of the Liberty Defendants' bad faith, Real Water

5  suffered and the bankruptcy estates now (or will in the future) face excess judgments, punitive

6  damages awards, fee and cost awards under NRCP 68 and NRS 17.117, statutory interest, and

7  other consequential damages.

8      178.    The Liberty Defendants are therefore liable to the Trustee, as representative of the

9  Real Water Debtors' estates, for all damages proximately caused by their bad faith, including

10 amounts in excess of policy limits and including punitive damages as allowed by Nevada law.

11                              **FOURTH CROSS-CLAIM**

12     **(Breach of the Implied Covenant of Good Faith and Fair Dealing – Contractual)**

13     179.    The Trustee realleges and incorporates by reference each and every allegation

14 contained in the preceding paragraphs as though fully set forth herein.

15     180.    Every contract, including the Policies, contains an implied covenant of good faith

16 and fair dealing requiring that neither party do anything to deprive the other of the benefits of the

17 agreement.

18     181.    The Liberty Defendants breached the implied covenant by, among other things: (i)

19 exercising settlement discretion unreasonably and for improper purposes; (ii) failing to fund

20 accepted settlements; (iii) delaying payment and deposit of undisputed amounts; (iv) using

21 coverage positions and bankruptcy proceedings as pretexts for delay; and (v) failing to

22 communicate material information to the Trustee and insured regarding settlement opportunities

23 and defense strategy.

24     182.    As a direct and proximate result of the Liberty Defendants breach of the implied

25 covenant, the Real Water Debtors' bankruptcy estates have suffered damages in an amount to be

26 proven at trial, including increased judgments, interest, fees, and consequential damages.

27     183.    The Trustee is entitled to recover all damages available for breach of the implied

28 covenant, including consequential damages and attorneys' fees where permitted.

1

**FIFTH CROSS-CLAIM**

2

**(Violation of NRS 686A.310 – Unfair Claims Practices)**

3      184.    The Trustee realleges and incorporates by reference each and every allegation

4   contained in the preceding paragraphs as though fully set forth herein.

5      185.    NRS 686A.310 prohibits insurers from engaging in unfair claims settlement

6   practices, including, among other acts, failing to effectuate prompt, fair, and equitable settlements

7   of claims in which liability has become reasonably clear; failing to adopt and implement

8   reasonable standards for the prompt investigation and processing of claims; and compelling

9   insureds to institute litigation to recover amounts due by offering substantially less than amounts

10  ultimately recovered.

11      186.    The Liberty Defendants engaged in unfair claims settlement practices in violation

12  of NRS 686A.310, including but not limited to: (i) failing to promptly and reasonably investigate

13  and evaluate settlement opportunities; (ii) failing to effectuate prompt, fair, and equitable

14  settlements when liability was reasonably clear; (iii) unreasonably delaying settlement and

15  payment under the pretext of bankruptcy and coverage litigation; (iv) failing to promptly pay

16  accepted offers of judgment and covered amounts; and (v) compelling the Trustee and/or insured

17  to incur litigation and enforcement proceedings to recover amounts due.

18      187.    As a direct and proximate result of the Liberty Defendants' statutory violations, the

19  Real Water Debtors' bankruptcy estates have suffered damages, including excess judgments,

20  increased interest obligations, attorneys' fees, costs, and other consequential damages, in an

21  amount to be proven at trial.

22      188.    The Trustee seeks all relief available under Nevada law for the Liberty Defendants'

23  violations of NRS 686A.310, including compensatory and consequential damages, prejudgment

24  interest, and such other relief as the Court deems just.

25

**SIXTH CROSS-CLAIM**

26

**(Equitable Estoppel / Waiver – Coverage Defenses Based on Defense-Controlled Conduct)**

27      189.    The Trustee realleges and incorporates by reference each and every allegation

28  contained in the preceding paragraphs as though fully set forth herein.

190.    The Liberty Defendants assumed control of Real Water's defense and settlement under reservations of rights. In doing so, they controlled counsel selection, litigation strategy, and settlement posture, while simultaneously pursuing coverage positions that conflicted with Real Water's interests.

191.    To the extent the Liberty Defendants now contend that coverage is barred or limited based on facts developed or positions taken in the underlying litigation (including admissions of liability, causation positions, and strategic stipulations), the Liberty Defendants are equitably estopped from asserting such defenses because they controlled, directed, or materially influenced the conduct giving rise to those purported defenses.

192.    The Liberty Defendants also waived certain coverage defenses by undertaking the defense and controlling critical litigation decisions without providing adequate, timely, and specific reservations of rights, without obtaining informed consent, and without taking reasonable steps to avoid prejudice to the insured and the bankruptcy estates.

193.    As a result, the Liberty Defendants should be barred and/or estopped from denying coverage and should be required to honor their obligations to pay policy benefits, supplementary payments, and other damages proximately caused by their conduct.

## SEVENTH CROSS-CLAIM

### (Contribution and Indemnity)

194.    The Trustee realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

195.    To the extent Plaintiff recovers any judgment against the Real Water, the Real Water are entitled to contribution and/or indemnity from the Liberty Defendants under the insurance policies, which require the Liberty Defendants to indemnify the Real Water for covered claims.

196.    Liberty Defendants are therefore liable to the Real Water for the full amount of any judgment Plaintiff obtains against the Real Water, plus interest, costs, and attorneys' fees.

. . .

. . .

## **EIGHTH CROSS-CLAIM**

**(Bad Faith - Conflict of Interest and Failure to Appoint Independent Counsel)**

197.    The Trustee realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

198.    Upon tendering coverage in or about March 2021, the Liberty Defendants assumed the defense of Real Water under a reservation of rights.

199.    The Liberty Defendants' reservation of rights asserted multiple coverage purported coverage defenses

200.    These coverage defenses created an immediate, fundamental, and disabling conflict of interest between the Liberty Defendants and Real Water.

201.    The conflict arose because the Liberty Defendants had directly opposing financial interests regarding settlement versus coverage litigation. Specifically, the Liberty Defendants' interest was paying less money by:

- Prevailing on coverage defenses (particularly "one occurrence" theory)
- Eliminating policy years from coverage
- Deny and refusing any settlement
- Litigating coverage issues rather than settling claims
- Waiting for Real Water's bankruptcy to eliminate liability beyond policy limits

In contrast, the Insured Interest was in avoiding catastrophic excess exposure by:

- Settling all viable claims within available policy limits
- Maximizing coverage from all available policy years
- Prioritizing settlement over coverage litigation
- Accepting reasonable settlement offers before verdicts could be rendered

202.    This conflict was not theoretical or speculative—it was actual, severe, and outcome-determinative. Every major decision the Liberty Defendants made favored their own coverage positions at Real Water's expense.

. . .

203.    Critically, this includes causing the Real Water Debtors to admit liability and effectively concede that all products were adulterated. This is part of their longstanding position that each injury is "one occurrence" and implicates only a single policy. In furtherance of this strategy, the Liberty Defendants failed to obtain qualified experts and conduct necessary discovery that would not only decrease potential judgments, but would also be contrary to the Liberty Defendants coverage position.

204.    Betting on their success in their coverage positions, the Liberty Defendants deliberately chose not to settle matters. Rather than resolve matters, the Liberty Defendants filed an adversary proceeding seeking declaratory relief on their coverage defenses. This declaratory relief action was filed at the precise moment when:

a.    Multiple settlement offers within policy limits were pending;

b.    Real Water faced catastrophic exposure from upcoming trials;

c.    No punitive damage awards had been entered;

d.    The insurers had a duty to prioritize settlement over coverage litigation; and

e.    Pursuing coverage defenses would delay and ultimately prevent settlement.

205.    The timing and nature of this declaratory relief action demonstrates that the Liberty Defendants prioritized their coverage positions over Real Water's need for settlement protection.

206.    The Liberty Defendants' conflict of interest directly influenced their settlement decisions. Specifically:

a.    If the Liberty Defendants settled claims by paying full policy limits, they would effectively waive or severely compromise their "one occurrence" coverage defense;

b.    If the Liberty Defendants settled claims across multiple policy years, they would effectively concede that those policy years were triggered;

c.    If the Liberty Defendants settled before prevailing on coverage defenses, they would pay significantly more than if they won those defenses.

207.    The evidence demonstrates that the Liberty Defendants' rejection of settlement offers was motivated by their desire to preserve and litigate coverage defenses, not by any

1   reasonable evaluation of settlement value or Real Water's interests.

2        208.    The Liberty Defendants' "one occurrence" theory was particularly problematic

3   because:

4        a.    The Liberty Defendants were incentivized to argue that all Real Water was

5              tainted.

6        b.    If successful, it would reduce available coverage from approximately $22

7              million to approximately $6-7 million;

8        c.    It created uncertainty about how much coverage was actually available for

9              settlement;

10       d.    It gave the Liberty Defendants a financial incentive to delay settlement until

11             the coverage issue was resolved in their favor or the bankruptcy estates

12             lacked the financial ability to dispute the action; and

13       e.    It made the Liberty Defendants unwilling to allocate settlement authority

14             across multiple claims because doing so would undermine their "one

15             occurrence" position.

16       209.    Real Water's interests required immediate settlement of as many claims as possible

17  within available limits. The Liberty Defendants' interests required delaying settlement until their

18  coverage defenses could reduce their payment obligations.

19       210.    Under Nevada law, when an insurer defends under a reservation of rights that

20  creates a conflict between the insurer's and insured's interests, the insurer has heightened duties:

21       a.    The insurer must resolve all doubts in favor of the insured;

22       b.    The insurer must not allow its coverage positions to interfere with its duty
23            to settle;

24       c.    The insurer must not subordinate the insured's interests to its own;
25       d.    The insurer must appoint independent counsel for the insured when a
             significant conflict exists; and
26
27       e.    The insurer remains fully liable for bad faith even when defending under a
             reservation of rights.

28  . . .

211.     The Nevada Supreme Court has recognized that conflicts of interest are particularly acute in the settlement context, where an insurer's coverage defenses can create strong financial incentives to reject reasonable settlements. That is especially the case here where the potential expose to the insured is in the billions.

212.     When such a conflict exists, the insurer's duty of good faith requires it to accept reasonable settlement offers within policy limits regardless of its coverage defenses or positions.

213.     Given the severe conflict of interest created by the reservation of rights and coverage defenses, the Liberty Defendants had a duty under Nevada law to appoint independent counsel to represent Real Water's interests separate from the Liberty Defendants' coverage interests.

214.     Instead of appointing independent counsel, the Liberty Defendants:

a.     Retained defense counsel from a firm with which the Liberty Defendants had a long-established relationship;

b.     Allowed the same counsel to represent both the Liberty Defendants' coverage interests and Real Water's defense interests;

c.     Failed to provide Real Water with independent legal advice regarding settlement opportunities;

d.     Failed to provide Real Water with independent evaluation of the Liberty Defendants' settlement decisions;

e.     Failed to ensure that Real Water received advice untainted by the Liberty Defendants' coverage positions; and

f.     Failed to communicate settle options and legal strategy with the Trustee, let alone through independent counsel.

215.     The defense counsel selected by the Liberty Defendants could not and did not provide truly independent advice to Real Water because:

a.     Counsel was selected, paid, and supervised by the Liberty Defendants;

b.     Counsel's ongoing relationship with the Liberty Defendants created an inherent loyalty to the Liberty Defendants' interests;

c.     Counsel was aware of the Liberty Defendants' coverage defenses and positions;

     d.     Counsel had financial incentives aligned with the Liberty Defendants, not Real Water;

     e.     Counsel could not advise Real Water to accept settlements that would undermine the Liberty Defendants' coverage positions; and

     f.     Counsel made all strategic directions at the direction of the Insureds and not Real water.

216.     Had independent counsel been appointed, Real Water would have received advice that:

     a.     The settlement offers should be accepted given Real Water's clear liability;

     b.     The Liberty Defendants' coverage defenses should not prevent settlement within available limits;

     c.     The Liberty Defendants' bankruptcy strategy was risky and not in Real Water's best interests;

     d.     The Liberty Defendants should file an interpleader action or seek court guidance on allocation rather than simply rejecting all offers;

     e.     The massive excess exposure warranted accepting reasonable settlement offers regardless of coverage disputes.

217.     Without independent counsel, Real Water was deprived of legal advice focused solely on Real Water's interests; unable to adequately evaluate the Liberty Defendants' settlement decisions; unable to adequately protect itself from the Liberty Defendants' conflicted decision-making; and left vulnerable to the Liberty Defendants' prioritization of coverage defenses over settlement obligations.

218.     The conflict of interest between the Liberty Defendants and Real Water was not merely procedural—it directly caused Real Water's catastrophic excess exposure in excess of $8 billion.

219.     As a direct and proximate result of the Liberty Defendants' conflict of interest and failure to appoint independent counsel, Real Water has suffered damages including: Excess judgments over $8.4 billion in verdicts that exceed available policy limits, when reasonable settlements totaling within policy limits would have resolved the underlying cases; Numerous pending cases with similar catastrophic exposure to be resolved; Substantial interest accruing on

excess judgments; The permanent loss of settlement opportunities that existed but were rejected due to the Liberty Defendants' conflicted decision-making; Costs incurred defending cases that should have been settled;

220.    These damages were the natural, probable, and foreseeable consequence of the Liberty Defendants' pursuit of coverage defenses at Real Water's expense, the Liberty Defendants' failure to appoint independent counsel; the Liberty Defendants' prioritization of their own financial interests over their duty to protect Real Water; and the Liberty Defendants' decision to litigate coverage rather than settle claims.

**PRAYER FOR RELIEF**

WHEREFORE, Cross-Claimant Ryan A. Andersen, Chapter 7 Trustee, prays for judgment against Liberty Defendants, and each of them, as follows:

1.    For declaratory relief as pleaded herein, including declarations regarding the Liberty Defendants duties to defend, settle, indemnify, and pay supplementary payments and interest;

2.    For an award of contract damages, including all policy benefits due under the Policies, supplementary payments, and interest;

3.    For an award of extra-contractual damages for the Liberty Defendants' bad faith, including the full amount of excess judgments and consequential damages proximately caused by the Liberty Defendants' conduct;

4.    For contribution and/or indemnity for any amounts for which the Real Water are found liable to Plaintiff, the Distributors or any personal injury plaintiff;

5.    For an award of all attorneys' fees, costs, and expenses recoverable by statute, contract, or equity, including (without limitation) attorneys' fees under NRS 18.010 and other applicable authority;

6.    For an award of prejudgment and post-judgment interest as allowed by law;

7.    For punitive damages against the Liberty Defendants based on their own oppression, fraud, or malice in claims handling and settlement, as allowed by Nevada law including NRS 42.005;

8.      For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

The Trustee, as cross-claimant, demands a trial by jury on all issues so triable.

DATED this 9th day of January, 2026.

BANKRUPTCY RECOVERY GROUP

*/s/ Dylan T. Ciciliano*
GREGORY E. GARMAN, ESQ.
Nevada Bar No. 6654
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
DYLAN CICILIANO, ESQ.
Nevada Bar No. 12348
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (702) 483-6126
*Attorneys for Defendants/Cross-Claimant*
*Ryan A. Andersen, Chapter 7 Trustee*

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that the foregoing **DEFENDANTS AFFINITYLIFESTYLES.COM,**

3

**INC. d/b/a REAL WATER AND REAL WATER, INC.'S ANSWER TO PLAINTIFF'S**

4

**COMPLAINT; COUNTERCLAIM AND CROSS-CLAIMS** was submitted electronically for

5

filing and/or service with the Eighth Judicial District Court on 9th day of January, 2026. Electronic

6

service of the foregoing document shall be made in accordance with the E-Service List to:[2]

7
8
9
10
11
12
13
14

WILL KEMP
NV Bar No. 1205
ERIC PEPPERMAN
NV Bar No. 11679
BREANNA SWITZLER
NV Bar No. 15653
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Email: c.pola@kempjones.com
        e.pepperman@kempjones.com
        b.switzler@kempjones.com

15

*Attorneys for Plaintiff Agnes Aleksander*

16
17
18
19

                                        */s/ Vicki Dimaio*
                                        An employee of
                                        GARMAN TURNER GORDON, LLP

20
21
22
23
24
25
26
27
28

---

[2] Pursuant to Administrative Order 14-2, dated May 9, 2014, service by electronic means is mandatory in the Eighth Judicial District Court. Further, pursuant to EDCR 8.05(a), each party who submits an E-Filed document through the E-Filing System consents to electronic service in accordance with NRCP 5(b)(2)(D); and, pursuant to EDCR 8.05(d), users who register with the electronic filing system are deemed to consent to receive service electronically.